***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stanback. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stanback with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. All parties are subject to and bound by the North Carolina Worker's Compensation Act.
4. An employer-employee relationship existed between the employee-plaintiff and the defendant-employer Public Storage Inc., and Specialty Risk Services was the insurer on the risk on the date of the injury of December 28, 2001.
5. The employee's average weekly wage is to be determined from a Form 22 submitted at the hearing.
6. Documents stipulated into evidence include the following:
a. Stipulated Exhibit #1 — Pre-Trial Agreement
b. Stipulated Exhibit #2 — Plaintiff's medical records
 c. Stipulated Exhibit #3 — Plaintiff's recorded statement
 d. Stipulated Exhibit #4 — Job description for property manager, assistant property manager and relief manager
 e. Stipulated Exhibit #5 — Correspondence from defendant-employer dated January 18, 2002
f. Stipulated Exhibit #6 — Form 22
g. Stipulated Exhibit #7 — Industrial Commission Forms
 h. Stipulated Exhibit #8 — Defendants' Answers to Plaintiff's Interrogatories
 i. Stipulated Exhibit #9 — Plaintiff-employee's personnel file
 j. Stipulated Exhibit #10 — Plaintiff's Answers to Defendants' Interrogatories
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the deputy commissioner, the plaintiff was 39 years old. Plaintiff graduated from high school in 1981. Prior to December 28, 2001, plaintiff's work experience included being a Certified Nursing Assistant ("CNA"), phlebotomist, division clerk for Guilford Technical Community College, fast food cashier and manager, and an on-site property manager for the defendant-employer.
2. In the early 1990's, the plaintiff underwent a laminectomy for a herniated disk at L3-4 performed by Dr. James Nitka, and a cervical fusion with metal plating at C5-6, C6-7 performed by a physician in South Carolina. Plaintiff re-injured her neck as the result of a fall in 1999; she received medical treatment but no further surgeries. Plaintiff was not receiving medical treatment for her neck or low back at the time of her application for employment with the defendant-employer in June of 2000. The plaintiff had been essentially pain free in her low back for about seven years prior to December 28, 2001 and had not experienced problems with her neck for at least two years prior to December 28, 2001.
3. The plaintiff did not work from January through June, 2000. Part of that time was spent caring for her mother who was ill.
4. On June 26, 2000, the plaintiff and her husband, Jay Hale, were hired to work as on-site property managers for the defendant-employer. The plaintiff was the on-site property manager, and her husband was the on-site assistant property manager. The couple was hired as a team.
5. The plaintiff's job duties as an on-site property manager included all aspects of property management, including administrative record keeping, receiving and stocking retail merchandise such as locks, storage packs, boxes and essentially all items necessary for use with the storage units.
6. The duties of the property manager required lifting items such as the "House Pak," which weighs fifty pounds, the "Storage Pak," weighing forty pounds, and the "Apartment Pak" and "Quik Pak," which weigh thirty pounds. There were also boxes of locks that weighed up to forty pounds. The plaintiff was required to lift storage unit doors, similar to a garage door, that required applying twenty-five pounds of force to open, and more than that if the door became stuck. Prior to December 28, 2001, the plaintiff was able to perform the essential functions of her job as an on-site property manager without difficulty.
7. Based on the Form 22 submitted by defendants, the plaintiff's base average weekly wage was $342.31. In addition to the base wage, plaintiff received as compensation fifteen percent (15%) on all retail sales, which retail sales averaged $750.00 per month. Fifteen percent (15%) of $750.00 over a twelve-month period calculates to an additional $25.96 per week, which should be included in plaintiff's average weekly wage. In addition, the defendant-employer added a housing allowance in lieu of wages, which was stipulated into evidence on the Form 22, valued at $133.38 per week, and a utility allowance of $23.08 per week. As plaintiff and her husband were hired as a team, it is necessary to divide the value of the housing allowance in half in calculating plaintiff's average weekly wage.
8. Plaintiff's average weekly wage should be calculated as follows:
Base Average Weekly Wage based on Form 22: $342.31 per week
Retail Sales Percentage ($750 per month X 15%) 25.96 per week
Housing Allowance in lieu of wages 66.69 per week
Utilities Allowance in lieu of wages 11.54 per week
TOTAL $446.50 per week
Plaintiff's average weekly wage was $446.50, yielding a compensation rate of $297.67.
9. On December 28, 2001, the plaintiff was unloading a truck that was delivering merchandise to the storage unit property. She lifted a box of retail merchandise weighing at least 30-40 pounds. Thereafter, she felt immediate pain in her mid and low back. The next day, plaintiff began experiencing pain in her neck.
10. On the same date, the plaintiff's husband, Jay Hale, reported the injury to the plaintiff's supervisor, Tom Humphrey. The injury was also reported to other members of management of the defendant-employer.
11. Thereafter, the plaintiff continued to have pain in her neck and low back, and was referred by the defendant-employer to Urgent Medical Care. On January 7, 2002, the plaintiff was seen at Urgent Medical Care where she was diagnosed with a low back injury and placed on a five-pound lifting restriction secondary to the injury of December 28, 2001.
12. On January 11, 2002, the plaintiff was again seen at Urgent Medical Care and continued on current lifting restrictions. The plaintiff was referred to the Greensboro Orthopedic Center.
13. On January 11, 2002, the defendant-employer could not provide the plaintiff with work within her lifting restriction and therefore placed plaintiff on a "workers compensation leave of absence." The plaintiff was given a choice of workers' compensation benefits, sick pay, or vacation pay. The plaintiff chose to accept sick pay in lieu of workers' compensation benefits.
14. By letter dated January 18, 2002, the defendant-employer terminated the plaintiff and her husband, Jay Hale. Pursuant to the terms of their employment contract, the couple was required to vacate the premises apartment within 72 hours.
15. On or about January 19, 2002, the defendant-employer attempted to retract the termination of the plaintiff by offering her a position as a relief manager, explaining that they had only intended to fire Mr. Hale. The duties of a relief manager are essentially the same as those of a property manager, however, a relief manager does not receive the same benefits offered to a property manager.
16. At the time the plaintiff was terminated on January 18, 2002, and at the time she was offered re-employment as a relief manager on January 19, 2002, plaintiff was under a five-pound lifting restriction given to her by the physicians at Urgent Medical Care on January 7, 2002, and continued on January 11, 2002. Additionally, the plaintiff was not physically able to perform the essential duties of either the property manager position, or the relief manager position. Therefore, the plaintiff was not offered suitable employment within her restrictions on January 19, 2002.
17. Plaintiff declined to accept the offer of relief manager, which was not an unjustified refusal of suitable employment.
18. On January 22, 2002, the plaintiff was seen by Dr. Richard Ramos, a specialist in Physical Medicine and Rehabilitation. Dr. Ramos diagnosed "low back pain secondary to work-related injury in November, 2001, and re-injury December, 2001, while at work," and placed the plaintiff on light duty restrictions of no lifting over twenty pounds, and alternate sitting and standing. Dr. Ramos did not doubt the validity of the plaintiff's history of the injury, or the validity of plaintiff's complaints of pain. In Dr. Ramos' opinion, the plaintiff's mid and low back pain were secondary to the lifting incident of December 28, 2001.
19. No other positions were offered to the plaintiff after January 19, 2002. Even assuming that the defendants maintained a standing offer of the position of relief manager after January 22, 2002, that position was not within the restrictions given by Dr. Ramos on January 22, 2002. Therefore, the plaintiff was not offered suitable employment nor did she refuse suitable employment from defendants on or after January 22, 2002.
20. For further treatment of plaintiff's back pain, Dr. Ramos performed selective nerve root blocks at the L3, L4, and S1. These injections were not successful, and the plaintiff continued to have mid and low back pain. Beginning on February 5, 2002, and continuing for several weeks, the plaintiff underwent physical therapy. Unfortunately, physical therapy was not successful, and her symptoms persisted.
21. Dr. Ramos recommended an MRI, the results of which revealed a left paracentral disc herniation at L3-4, and a possible pars interarticularis defect at L5-S1. On February 28, 2002, Dr. Ramos took the plaintiff completely out of work and back-dated her disability note to January 19, 2002. In his deposition, Dr. Ramos indicated that the note was written by his assistant. However, Dr. Ramos never retracted this out-of-work statement; he only qualified the note by testifying that it should not have been back-dated any earlier than February 12, 2002.
22. The plaintiff was seen for a surgical consult with Dr. Jeffrey Beane, orthopedic surgeon. Dr. Beane examined the plaintiff and indicated that she had suffered a recurrent disc protrusion at L3-4 with spondylosis on the left at L5-S1. He also suggested that she may have to undergo a re-do of her original discectomy.
23. Dr. Ramos continued to treat the plaintiff with an L3-L4 nerve root block and a trigger point injection in the left upper trapezius. The trigger point injection produced good results, however, the plaintiff continued to experience back pain.
24. On May 3, 2002, the plaintiff was seen by Dr. James Nitka, the orthopedic surgeon who performed plaintiff's original lumbar surgery. After an examination, Dr. Nitka could not verify that plaintiff's pain was coming from the pars defect, and he considered it unlikely that her spondylosis was the source of her pain. He did not recommend surgery, and he further determined that plaintiff's complaints of pain did not correlate with the physical exam.
25. Dr. Nitka opined that plaintiff's spondylosis was not caused by the lifting incident of December 28, 2001, but it may have exacerbated it. Dr. Nitka also could not associate plaintiff's disc protrusions with her exam findings and thought it was difficult to relate the disc protrusion to the lifting incident. Dr. Nitka further could not relate plaintiff's pain at level S1 with the lifting incident.
26. Dr. Nitka considered plaintiff capable of performing a light duty job with alternate sitting, standing and walking with a maximum lift requirement of fifteen pounds. He also indicated that an FCE was needed to fully determine plaintiff's work capacity.
27. Dr. Ramos opined that plaintiff's low back pain was related to her injury by accident or specific traumatic incident of December 28, 2001. He also testified that there was a possibility that the incident of December 28, 2001 aggravated the plaintiff's pars interarticularis defect; however, he did not consider this to be the source of plaintiff's pain.
28. The plaintiff was released to return to work on light duty on July 2, 2002 and by September 19, 2002, Dr. Ramos considered plaintiff to be at maximum medical improvement with a three percent (3%) permanent partial disability to her back.
29. The plaintiff sought a second opinion from Dr. Vincent Paul, an orthopedic surgeon on August 2, 2002. Dr. Paul indicated that a myelogram and/or discogram was needed in order to determine plaintiff's source of pain, but he assumed the pain was emanating from L3-L4 without the benefit of further testing. Dr. Paul opined that the lifting incident of December 28, 2001 either caused or aggravated the condition of plaintiff's back for which she sought treatment. Dr. Paul thought plaintiff was capable of light, sedentary work with no lifting over ten pounds, and that she was at maximum medical improvement with a ten percent (10%) permanent partial disability.
30. The greater weight of the medical evidence establishes that plaintiff's low back pain for which she received medical treatment was causally related to her injury by accident of December 28, 2001.
31. As a result of her injury by accident of December 28, 2001, the plaintiff has been unable to earn wages in any employment based on her current work restrictions, through September 19, 2002, the date plaintiff reached maximum medical improvement. As maximum medical improvement was reached following the hearing before the deputy commissioner, the record is unclear as to plaintiff's disability after that date.
32. Defendants contend that plaintiff has been able to earn wages, subsequent to the hearing before the deputy commissioner. However, at this time, there is no evidence before the undersigned regarding this matter.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On December 28, 2001, the plaintiff sustained an injury by accident arising out of and in the course and scope of her employment with the defendant-employer, resulting in neck and back injuries. N.C. Gen. Stat. § 97-2(6).
2. As a result of said injuries, the plaintiff was placed on work restrictions that prevented her from completing her regular job duties. Based on those work restrictions and her level of pain associated with her injuries, the job of relief manager offered to the plaintiff was not suitable employment. Plaintiff did not unjustifiably refuse suitable employment when she did not accept the position as relief manager. N.C. Gen. Stat. § 97-32.
3. On January 18, 2002, the defendant-employer terminated the plaintiff and her husband, Jay Hale. The defendant-employer did not offer any evidence that they would have terminated any other non-disabled employee, for the same reason that plaintiff was terminated. The plaintiff did not constructively refuse suitable employment.Williams v. Pee Dee Elec. Membership Corp., 130 N.C. App. 298,502 S.E.2d 645 (1998); N.C. Gen. Stat. §§ 97-29; 97-32.
4. The calculation of plaintiff's average weekly wage should include a percentage of retail sales, and housing and utilities allowances. Therefore, plaintiff's average weekly wage was $446.50, yielding a compensation rate of $297.67. N.C. Gen. Stat. § 97-2(5).
5. Plaintiff is entitled to have defendants provide all medical treatment for injuries resulting from her compensable injury that is reasonably necessary to effect a cure, give relief or lessen her period of disability. N.C. Gen. Stat. §§ 97-25; 97-2(19).
6. Plaintiff is entitled to temporary total disability compensation at the rate of $349.84 per week for the time period beginning January 19, 2002, through September 19, 2002, the date plaintiff reached maximum medical improvement. As maximum medical improvement was reached following the hearing before the deputy commissioner, the record is unclear as to plaintiff's disability after that date. N.C. Gen. Stat. § 97-29.
7. Plaintiff has a ten percent (10%) permanent partial impairment rating to her back. N.C. Gen. Stat. § 97-31(23).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Subject to attorney's fees approved herein, defendants shall pay to plaintiff, temporary total disability compensation at the rate of $297.67 per week for the period beginning January 19, 2002, and continuing until September 19, 2002, as the record is unclear as to disability following maximum medical improvement. If the parties are unable to agree regarding plaintiff's disability following that date, either side may file a Form 33 Request for Hearing on that issue.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of her compensable injury when bills for the same have been submitted to defendant and approved pursuant to procedures established by the Commission.
3. An attorney's fee in the amount of twenty-five percent (25%) of the compensation in Paragraph 1 of this AWARD is hereby APPROVED for plaintiff's counsel, and shall be paid to plaintiff's current counsel.
4. Defendants shall pay the costs.
This the 30th day of August, 2004.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER